FCBLECHC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        15 CR 445 (PAE)

5   JONATHAN RODRIGUEZ, et al.,

6              Defendants.

7   ------------------------------x

8                                   New York, N.Y.
                                    December 11, 2015
9                                   10:03 a.m.

10

    Before:
11
                      HON. PAUL A. ENGELMAYER,
12
                                    District Judge
13

14                       APPEARANCES

15  PREET BHARARA
        United States Attorney for the
16      Southern District of New York
    JAMES McDONALD
17  SAMSON ENZER
    DINA McLEOD
18      Assistant United States Attorneys

19  GERALD DiCHIARA
        Attorney for Defendant Andrew Echevarria
20
    JAMES ROTH
21      Attorney for Defendant Marquis Wright

22  JOHN DIAZ
        Attorney for Defendant Jordan Rivera
23
    KAFAHNI NKRUMAH
24      Attorney for Defendant Daquann McBeth

25         (Appearances continued on next page)

FCBLECHC

APPEARANCES (Cont'd)

JOHN BURKE
     Attorney for Defendant Raheem Amarizan

THOMAS DUNN
     Attorney for Defendant William Knox

GUY OKSENHENDLER
     Attorney for Defendant Miguel Romero

SCOTT TULMAN
     Attorney for Defendant Kaye Rosado

STEPHANIE CARVLIN
     Attorney for Defendant Naquann Simmons

JESSE SIEGEL
     Attorney for Defendant Wilfredo Rivera

IRA LONDON
     Attorney for Defendant Vincent Fielder

JOHN MERINGOLO
     Attorney for Defendant Mia Dentico

AARON GOLDSMITH
     Attorney for Defendant Pamela Brown

FCBLECHC

1              (Case called)

2              MR. McDONALD:  Good morning, your Honor.  James

3    McDonald, Samson Enzer, and Dina McLeod for the government.

4              THE COURT:  Very good.

5              THE DEPUTY CLERK:  Counselors for the defense, present

6    for Andrew Echevarria.

7              MR. DiCHIARA:  Gerald DiChiara, and Mr. Echevarria is

8    seated in the second row.

9              THE COURT:  Why don't I ask everyone to be seated and

10   when my deputy, Mr. Smallman, calls the name of the defendant,

11   please raise your hand so that I can acknowledge you.

12             And, counsel, when you appear on behalf of a

13   defendant, please stand up so I can see you.

14             Good morning to you, Mr. DiChiara.

15             Where is Mr. Echevarria?  Very good.  Good morning to

16   you.

17             THE DEPUTY CLERK:  Jonathan Rodriguez.

18             THE COURT:  Where is Mr. Rodriguez?

19             MR. McDONALD:  Your Honor, Mr. Rodriguez was arrested

20   in upstate New York and he's not yet been transferred down here

21   to the Southern District.

22             THE COURT:  Very good.  Thank you.

23             THE DEPUTY CLERK:  Marquis Wright.

24             MR. ROTH:  Good morning, your Honor.  James Roth on

25   behalf of Mr. Wright.

FCBLECHC

1           THE COURT:  Good morning to you, Mr. Roth, and good

2    morning to you, Mr. Wright.

3           THE DEPUTY CLERK:  Wali Burgos.

4           MR. McDONALD:  Your Honor, defendant Burgos is

5    currently in state custody and hasn't been transferred down to

6    federal custody just yet.

7           THE COURT:  All right.  Thank you.

8           THE DEPUTY CLERK:  Jason Benjamin.

9           MR. McDONALD:  Jason Benjamin was also arrested on

10   December 9 in the Northern District of New York and has not yet

11   been transferred down to Southern District.

12          THE COURT:  Very good.

13          THE DEPUTY CLERK:  Jordan Rivera.

14          MR. DIAZ:  Good morning, your Honor.  John Diaz

15   appearing for Mr. Rivera.

16          THE COURT:  Good morning.

17          THE DEPUTY CLERK:  William Amarizan.

18          MR. NKRUMAH:  Good morning, your Honor.  Kafahni

19   Nkrumah standing in for Ms. Susan Marcus and Mr. Amarizan.

20          THE COURT:  Good morning.

21          Mr. Nkrumah, any idea why Ms. Marcus is not able to be

22   here today?

23          MR. NKRUMAH:  No, your Honor.  I know when we did the

24   presentment, she asked if I could stand in.

25          THE COURT:  I understand.  Given that the arrests in

FCBLECHC

| | |
|---|---|
| 1 | this case were made two days ago and that the first conference |
| 2 | was today, I can understand that.  I fully expect she'll be |
| 3 | able to be here at future conferences.  Thank you. |
| 4 | THE DEPUTY CLERK:  Raheem Amarizan. |
| 5 | MR. BURKE:  Good morning, your Honor.  For |
| 6 | Mr. Amarizan, John Burke. |
| 7 | Judge, with the Court's permission, I have a sentence |
| 8 | at 10:30, so Mr. Meringolo will cover for me if I have to leave |
| 9 | at 10:20. |
| 10 | THE COURT:  Very good.  Good morning to you, |
| 11 | Mr. Amarizan.  Good morning to you, Mr. Burke.  And thank you |
| 12 | for bringing that to my attention.  Of course, that's fine. |
| 13 | THE DEPUTY CLERK:  Tjon Macoll. |
| 14 | MS. CARVLIN:  Yes, good morning, your Honor. |
| 15 | Stephanie Carvlin.  I am appearing on behalf of Michael Sporn, |
| 16 | your Honor, for Mr. Macoll.  Mr. Sporn had a preexisting court |
| 17 | appearance for today. |
| 18 | THE COURT:  Very good.  Mr. Macoll, who are you?  Good |
| 19 | morning to you. |
| 20 | Ms. Carvlin, thank you for covering today. |
| 21 | THE DEPUTY CLERK:  Corey Heyward. |
| 22 | MR. McDONALD:  Your Honor, Corey Heyward is one of |
| 23 | three defendants in this indictment who have not yet been |
| 24 | apprehended. |
| 25 | THE COURT:  Thank you. |

FCBLECHC

1           THE DEPUTY CLERK:  Jonathan Harris.

2           MR. McDONALD:  I should have said, your Honor, that

3  Corey Heyward was one of five defendants who have not yet been

4  apprehended.  There are two who we have been informed will be

5  self-surrendering this morning.  Jonathan Harris is one of

6  them.

7           THE DEPUTY CLERK:  William Knox.

8           MR. DUNN:  For William Knox, Thomas Dunn.  Good

9  morning, your Honor.

10           THE COURT:  And where is Mr. Knox?

11           MR. DUNN:  He's standing up.

12           THE COURT:  Good morning, Mr. Knox.  Good morning,

13  Mr. Dunn.

14           THE DEPUTY CLERK:  Corey Cooks.

15           MR. McDONALD:  Corey Cooks, your Honor, is the second

16  defendant who we anticipate to self-surrender this morning.

17           THE DEPUTY CLERK:  Daquann McBeth.

18           MR. NKRUMAH:  Good morning, your Honor.  Mr. Nkrumah

19  for Mr. McBeth, who's standing.

20           THE COURT:  Good morning, Mr. McBeth.  Thank you.

21  Good morning, Mr. Nkrumah.

22           THE DEPUTY CLERK:  Jahnomi Benjamin.

23           MR. McDONALD:  Defendant Benjamin is currently in

24  state custody, your Honor, and has not yet been writted down to

25  federal custody.

FCBLECHC

1          THE DEPUTY CLERK:  Keith Ruiz.

2          MR. McDONALD:  Keith Ruiz is currently in federal

3     custody in Florida, your Honor, and has not yet been

4     transferred to the Southern District.

5          THE COURT:  Thank you.

6          THE DEPUTY CLERK:  Ryan Valentin.

7          MR. McDONALD:  Ryan Valentin, your Honor, is one of

8     the three remaining defendants who have not yet been

9     apprehended, assuming that the two that we believe will be

10    self-surrendering this morning do in fact self-surrender.

11         THE DEPUTY CLERK:  Miguel Romero.

12         MR. OKSENHENDLER:  Good morning, your Honor.  I'm Guy

13    Oksenhendler for Mr. Romero.

14         THE COURT:  Good morning, Mr. Romero.  Good morning to

15    you, Mr. Oksenhendler.

16         THE DEPUTY CLERK:  Kaye Rosado.

17         THE COURT:  All right.  Good morning to you,

18    Mr. Rosado.

19         MR. DUNN:  Your Honor, I'll stand up for Scott Tulman,

20    who's the attorney.  I'll stand up for purposes of the

21    conference.

22         THE COURT:  Thank you, Mr. Dunn, for standing in for

23    Mr. Tulman.  He in fact notified our chambers that he was

24    running late this morning.

25         THE DEPUTY CLERK:  Naquann Simmons.

FCBLECHC

1          MS. CARVLIN:  Good morning again, your Honor.

2    Stephanie Carvlin for Naquann Simmons.

3          THE COURT:  Good morning.

4          THE DEPUTY CLERK:  Diquinn Lacend.

5          MR. McDONALD:  Your Honor, Diquinn Lacend is currently

6    in state custody and has not yet been transferred to federal

7    custody.

8          THE COURT:  Thank you.

9          THE DEPUTY CLERK:  Wilfredo Rivera.

10         MR. SIEGEL:  Good morning, Judge.  Jesse Siegel for

11   Mr. Rivera.

12         THE COURT:  Good morning.

13         THE DEPUTY CLERK:  Kenneth Jenkins.

14         MR. McDONALD:  Kenneth Jenkins, your Honor, is the

15   final defendant who has not yet been apprehended.

16         THE COURT:  Thank you.

17         THE DEPUTY CLERK:  Vincent Fielder.

18         MR. LONDON:  Ira London for Vincent Fielder.

19         THE COURT:  Good morning, Mr. London.  Good morning to

20   you, Mr. Fielder.

21         THE DEPUTY CLERK:  Mia Dentico.

22         MR. MERINGOLO:  Good morning, your Honor.  John

23   Meringolo for Ms. Dentico.

24         THE COURT:  Good morning.

25         THE DEPUTY CLERK:  Pamela Brown.

FCBLECHC

1          MR. GOLDSMITH:  Good morning, your Honor.  Aaron

2    Goldsmith on behalf of Ms. Brown.

3          THE COURT:  Good morning, Mr. Goldsmith.  Good morning

4    to you, Ms. Brown.

5          With respect to the defendants who have not yet

6    appeared, I have no choice today but to set an overall global

7    schedule which will bind them.  That said, I'm interested in

8    making had sure that they and their counsel get before me as

9    soon as possible.  Therefore, I will ask the government to

10   contact my chambers as individual defendants are apprehended or

11   brought into the district, as the case may be.  Ideally, we can

12   come up with a date next weak to capture as many of those

13   people in one conference as possible so as not to have a need

14   for too many one-off conferences.  But I'll ask the government

15   to be proactive in keeping me abreast of the state of play with

16   respect to those defendants.

17         MR. McDONALD:  Of course, your Honor.

18         THE COURT:  All right.  I have a number of

19   housekeeping matters.  To begin with, I want to acknowledge, to

20   the extent there are people in the overflow room, I want to

21   welcome you.  Not knowing how many friends or family would be

22   here today, we arranged for an overflow room in Courtroom 506

23   so that friends or family would be able to listen.  It may be

24   that that's unnecessary.  There appears to be extra space here.

25   But to the extent there are people in Room 506, I want to

FCBLECHC

1    welcome you.

2            Counsel, I understand from my deputy that no defense

3    lawyers have indicated there's a need for interpreters.  Is

4    that correct?

5            MR. ROTH:  Yes, your Honor.

6            THE COURT:  Thank you.  I want to also just take a

7    moment and thank our marshals and court security officers.

8    Obviously, in a case of this scale, there's a lot of planning

9    that goes into organizing a conference like this and keeping

10   everything orderly and safe.  And so I want to thank everyone

11   for their efforts in organizing today.  Thank you.

12           With respect to that, the marshals and court security

13   officers advised my chambers that given the sheer number of

14   defendants, there would be a need for restraints to be put on

15   the defendants today given the sheer number of people.

16   Obviously, that's not an ideal situation, but I hope everyone

17   understands that it is inherent in the number of people put

18   together in the jury box.  As the case moves forward, we'll be

19   attentive to figuring out if there are ways to avoid that in

20   the future.  I just want everyone to know I'm sensitive to the

21   situation.  All right.

22           With respect then to today, here's what I'm going to

23   do.  I want to give you, first of all, an overview of the

24   ground I intend to cover and then we'll go through each of the

25   individual items.

FCBLECHC

1          To begin with, I'll be calling shortly on government

2     to give me reports on a number of fronts.  These were largely

3     the ones that were covered in the order that I issued

4     yesterday, but they include a description of the scope and

5     nature and charges in the case, a description of the nature of

6     discovery in the case.  I want a report on the types of

7     searches and seizures and postarrest statements that may have

8     occurred in the case so that we can all get an early read out

9     on areas of potential suppression motions.  And I'm interested

10    really in getting the government's view on the trajectory of

11    the case going forward, including the possibility of

12    superseding indictments and the like.

13          After we go through all those topics, I'm going to

14    open the floor to defense counsel to raise any and all issues.

15    One of the issues that's foremost on my mind is to set a

16    rational next conference date in the case, and I'll be

17    interested in counsel's views on the subject.

18          For everyone's benefit, although I'm obviously open to

19    hearing contrary views, my initial view, which is informed in

20    part by having handled a 76-defendant gang case that spanned

21    the last several years, is that in a case of this scale, it's

22    better to go step by step.  It's ill advised to commit at a

23    first conference to a long term schedule, including a trial

24    date and things of that nature.  I'm very much mindful that the

25    scope of charges may change, the number of defendants may

1    change and expand.  There may be superseding indictments.

2           And so it seems to me rational instead at an initial

3    conference like this to start the process of educating all of

4    us as to what this case is about and to set a next conference

5    date that's far enough into the future that defense counsel are

6    up to speed as to what the case looks like and so that we all

7    when we come together again will have a better sense of the

8    challenges presented by this case.

9           And so subject to what I hear from counsel today, my

10   expectation is that at the end of this conference, I'm going to

11   set a next conference date probably a couple of months from

12   now.  And my expectation is that at that conference we would be

13   taking up, among other things, perhaps a deadline for a

14   superseding indictment, a timetable for addressing suppression

15   motions, and possibly a trial date or dates.  Again, I'm open

16   to hearing contrary views.  But borne of the experience in a

17   much larger gang case, that seems to me the rational way to go

18   here.

19          I want to say a word or two looking far down the road

20   about the prospect of a trial in this case.  I want to

21   underscore in particular something I wrote in the order that I

22   issued yesterday.  There are some 26 or so defendants named in

23   the indictment and something short of 20, but not far short,

24   defendants present here today.  I have and I suspect no one

25   here has any way to project how many of these defendants will

one day go to trial, if any.  But so that all counsel know, it

is my policy not hold any single trial involving more than

approximately five defendants.

         In my judgment and experience, a trial on that scale

simply is unfair to the defendants.  It's impossible for a jury

or hard for a jury to keep the defendants and the individual

charges straight.  And so as a matter of ensuring fairness to

the defendants in the event down the road we get to a point

where there are more than approximately five defendants going

to trial, it's my expectation that we would have multiple

trials to avoid that problem.

         All of this is obviously for far down the road.  It's

going to become much clearer over time which defendants are

likely to go to trial and which of those defendants are

properly and fairly tried together.  But I wanted to put down a

marker and a reassurance at this point about that.  When the

case has taken more shape and counsel can better advise me in

the event that numerous defendants appear to be headed towards

trial, we can take up the issue of what the right group or

groups are.

         As a final preface before I call on the government, I

want to say a word about issues that are specific to individual

defendants.  I fully expect there are going to be some such

issues.  They may involve matters of bail.  They may involve

matters of representation.  This many defendant conference is

FCBLECHC

 1    not the forum at which to resolve those issues.

 2              With respect to bail, here is how I'd like to proceed.

 3    In the event that either party wants to appeal an adverse bail

 4    determination, please get a determination from the magistrate

 5    judge, in other words, fully litigated in front of the

 6    magistrate judge.  If you are dissatisfied and you want to

 7    appeal the outcome, call my chambers and schedule a conference

 8    with my deputy, Mr. Smallman.  Make sure that in advance of the

 9    conference I have the pretrial services report and the

10    transcript of the hearing before the magistrate judge so that I

11    can familiarize myself with it before the bail appeal

12    conference.

13              For everyone's benefit, two such appeals were heard

14    yesterday involving defendants Dentico and Brown.  And

15    following this conference, after we take a brief break, I will

16    be continuing that conference today.  I left the issue there

17    unresolved at the end of yesterday's conference.

18              Relatedly, in my experience, there may be issues

19    relating to representations, individual representations.  I've

20    already received a letter from Mr. Dunn relating to his client,

21    Mr. Knox, indicating there may be an issue in connection with

22    that representation.  I'm happy to have an individual

23    conference scheduled to take that up, but I'm not going to do

24    it in front of the whole group.

25              MR. DUNN:  Your Honor, at this point it's in abeyance

FCBLECHC

1    or withdrawn.

2           THE COURT:  Very good.  You'll let me know if you

3    believe or your client believes a conference of that nature is

4    necessary and I'll be happy to schedule one.  Okay?

5           MR. DUNN:  Thank you, your Honor.

6           THE COURT:  But thank you for your letter.  I

7    appreciated it.

8           With that and with that lengthy preface, let me call

9    on the government.  I want to take this step by step.

10          I take it, Mr. McDonald, you'll be the primary

11   spokesman today?

12          MR. McDONALD:  Yes, your Honor.

13          THE COURT:  Tell us about the case.  I'm interested in

14   understanding the overall charges.

15          MR. McDONALD:  Sure, your Honor.

16          The superseding indictment in this case charges 26

17   defendants in six counts.

18          Count One is a racketeering conspiracy which charges

19   all 26 defendants with the racketeering conspiracy.

20          Count Two is murder in aid of racketeering.

21          Count Three is assault with a deadly weapon and

22   attempted murder in aid of racketeering.

23          Count Four is another assault and attempted murder in

24   aid of racketeering charge.

25          Count Five charges a narcotics conspiracy.

FCBLECHC

1          And Count Six charges using and carrying and

2    possessing a firearm during and in relation to the racketeering

3    conspiracy, which was discharged.

4          The charges in this case arise out of a federal

5    investigation that is included in an investigation by this U.S.

6    Attorney's Office, the ATF, the DEA, and the New York City

7    Police Department.  That investigation has been ongoing for

8    more than a year, and there was an ongoing New York City Police

9    Department investigation into the activities of the enterprise

10   which is known as 18 Park even before then.

11          THE COURT:  What does 18 Park refer to?

12          MR. McDONALD:  18 Park is a violent street gang, your

13   Honor, and the name was derived from the fact that many of the

14   members of 18 Park attended the same elementary school in the

15   area which is known as PS 18 and there's a park right outside

16   it.  And so the individuals who lived in the area went to

17   elementary school together in the area and really what began as

18   a relationship between individuals who went to school together

19   matured into a relationship that involved a gang, violent

20   activity, and narcotics trafficking.

21          There are various points in time when the gang was

22   known by other names.  Initially they were known as Young Money

23   and there were a few other names before they ultimately settled

24   on the name 18 Park.  The gang has a handshake.  There are

25   signs.  The gang has a hierarchy.  The older members of the

FCBLECHC

1    gang lead the gang.  They can direct the activities of the

2    younger members.  They resolve disputes among the younger

3    members, and they set rules or give advice.

4           For example, typically when the members and associates

5    of the gangs conduct shootings, 13 of which are specified as

6    overt acts in this indictment, the older members have told the

7    younger members, when you're going to commit a shooting, go in

8    groups.  Three is ideal, two is better than one.  And when you

9    do these shootings, one person is the shooter.  That person

10   carries the gun and commits the shooting.  One person serves as

11   a lookout.  The third person should serve to hold the door to

12   one of the Patterson House buildings.  That's because these

13   doors often lock.

14          And what you see in a lot of these shootings is you

15   see the members of 18 Park going into an area -- just to use

16   one example, the October 2, 2014 shooting.  That's an attempted

17   murder of Daymar Morales, which is charged in Count Three of

18   the indictment.  That involved defendant Wali Burgos, defendant

19   Jordan Rivera, defendant Corey Cooks, and a co-conspirator who

20   is not named in the indictment.

21          During that shooting there's video surveillance that

22   shows Wali Burgos, Jordan Rivera, and Corey Cooks meeting in

23   the Patterson House building.  They're gathering there.  Then

24   you see them from a different angle looking out the back window

25   of the back door.  They see the leader of the rival gang walk

FCBLECHC

 1    through the courtyard.  You see defendant Corey Cooks open the

 2    door and he holds the door while defendant Wali Burgos steps

 3    outside and fires a number of shots at the leader of the rival

 4    gang.  The shots didn't hit the rival gang -- this is all shown

 5    on video surveillance -- but it hit his hat and it knocked the

 6    baseball cap he was wearing off his head.  The member of the

 7    rival gang ducked down, runs into the other building.

 8            I'll talk about the scope of discovery here in just a

 9    few minutes and what the discovery will entail, but that same

10    day, October 2, 2014, defendant Burgos sent a Facebook message

11    to this member of the rival gang and the Facebook message said

12    "almost."

13            So there is a hierarchy to the gang.  There are

14    leaders who direct the activity of the younger members of the

15    gang.  They give them direction as to how to carry out their

16    violent acts.  They also give them direction as to how to carry

17    out narcotics activity.  The older members of the gang

18    typically supply the drugs to the younger members.  The older

19    members and the leaders of the gang are typically not the ones

20    who are out there doing the hand-to-hand sales, but they go get

21    the drugs.  They bring them to various stash houses.

22            For a long period of time, that stash house was the

23    residence of defendant Mia Dentico.  Later, the stash house

24    became an apartment that was the residence of another

25    coconspirator of the gang who is not named in this indictment.

FCBLECHC

```
1              Over time, the operation of the gang expanded.
2     Initially it was focused primarily in the Patterson Houses.
3     That's still the central focus of the gang.  That's still where
4     most of the violent activity occurs.  And within the Patterson
5     Houses, 18 Park occupies the north side.  East 143rd Street
6     serves at the dividing line between 18 Park on the north side
7     of the Patterson Houses and a rival gang that occupies the
8     territory on the south side of Patterson Houses.  That
9     territory, each gang views it as its own turf.  It's that
10    gang's territory in which it sells narcotics and which it
11    protects with violent activities and it seeks to expand or
12    seeks to encroach upon the other gang's territory.
13              THE COURT:  I may be getting ahead of you here, but at
14    least I noted that a substantial multidefendant case was
15    brought apparently around the same time involving a gang called
16    the Young Gunnaz.  Is that the rival gang you're referring to?
17              MR. McDONALD:  That actually is not the rival gang I'm
18    referring to, your Honor.
19              There were three gangs operating in the area, two of
20    which are subject to indictments that were unsealed on
21    Wednesday.  The Young Gunnaz is the gang I was just about to
22    turn to.  They operate primarily in the Mott Haven Houses
23    development, and that's a hosing development that borders the
24    Patterson Houses.  It's very near the Patterson Houses, but
25    it's not based within the Patterson Houses.
```

FCBLECHC

```
 1            The other rival gang that I referred to earlier is
 2   subject to an ongoing federal investigation.
 3            THE COURT:  Is there any relationship between this
 4   case and the indictment in the Young Gunnaz case?
 5            MR. McDONALD:  There is, your Honor.  They are also
 6   rival gangs.  For a substantial period of time, the Young
 7   Gunnaz were affiliates of the rival gang that I referred to on
 8   the south side of the Patterson Houses.  The Young Gunnaz was a
 9   more mature, larger organization.  It had access to more
10   firearms and was a more violent gang and so they came in and
11   protected the younger --
12            THE COURT:  I take it there are no defendants in
13   common to the two cases.
14            MR. McDONALD:  There are no defendants in common to
15   the two cases, though there is substantial overlap in evidence.
16            THE COURT:  Okay.  Thank you.  All right.  That's very
17   helpful.  Thank you.
18            Let me just ask you to the extent that you can say,
19   let me begin with this.  I noted that there is a murder that is
20   charged in the indictment of Johnny Moore, May 29, 2011, and
21   the defendant Keith Ruiz is named in that.  Is that murder
22   subject to potential capital review?
23            MR. McDONALD:  That is, your Honor.  Our office has
24   submitted an extenuating circumstances memorandum to
25   Washington, D.C., and we will keep them apprised.  But it is
```

FCBLECHC

1    subject to capital review, your Honor.

2         THE COURT:  All right.  Thank you.

3         To the extent you can say, is there anything you can

4    tell me at this stage vis-a-vis the potential for superseders?

5         MR. McDONALD:  Yes, your Honor.  This indictment goes

6    into great detail as to a number of the violent acts that this

7    gang is responsible for, but this is not all the violent acts.

8    We're continuing to investigate.  We're continuing to

9    investigate the May 29, 2011 murder of Johnny Moore.  It's

10   correct defendant Keith Ruiz is charged with that murder.

11   There is a possibility that other defendants, including other

12   defendants named this indictment, would be charged with that

13   murder.

14        The office is currently investigating other murders

15   that we believe that members of 18 Park are responsible for.

16   And the office is continuing to investigate other violent acts,

17   including some of the other violent acts that are listed in the

18   overt act portion of the indictment that could result in other

19   substantive charges of violent acts in aid of racketeering

20   along the lines of Counts Three and Four of this indictment.

21        So to answer your Honor's question, there is a

22   possibility that there would be a superseding indictment,

23   though we're prepared to proceed on this indictment.

24        THE COURT:  All right.  Thank you.  Very helpful.

25        All right.  Continuing on the list of topics that I

FCBLECHC

1    indicated to you in my order yesterday I'd be asking you about,

2    can you give an overview of the Rule 16 discovery with a

3    particular focus on what has been produced, if anything, what

4    remains to be produced, and what the timetable is likely to be.

5             MR. McDONALD:  Yes, your Honor.  There are a number of

6    different categories of discovery and I'll run through them one

7    at a time for the Court.

8             The first category are Title III wiretap intercepts.

9    With respect to those, the government is prepared to produce

10   the applications, the orders, the calls themselves, the draft

11   line sheets and transcripts subject to a draft transcript

12   stipulation signed by each of the defense counsel.

13            And to give the Court an overview of the extent of

14   that wiretap material, there was a 2015 Southern District of

15   New York wiretap.  That was a roving wiretap and that was a

16   wiretap of the various and changing cell phones that were

17   utilized by defendant Marquis Wright.  Over the period of time,

18   there was a three-month period of time, so there were three

19   separate wiretap orders on defendant Wright's phones.  During

20   the roving interception period, he used at least 11 different

21   cellular telephones.

22            He was arrested on a state marijuana charge and he had

23   seven cellular phones at that time.

24            THE COURT:  When was he arrested?

25            MR. McDONALD:  Your Honor, I don't have the exact date

FCBLECHC

1      in front of me, but it was in the fall of 2015.

2                  THE COURT:  And he had seven phones on his person?

3                  MR. McDONALD:  Seven phones on his person.

4            The government, pursuant to the roving wiretap orders,

5      intercepted communications from six different phones used by

6      defendant Wright.  There are approximately 10,000 calls that

7      were intercepted, and those interceptions covered the time

8      period from August of 2015 to the date of the arrest,

9      December 9, 2015.

10                 THE COURT:  And of the 10,000 calls intercepted, is

11     there any way of giving me a rough estimate of how many appear

12     potentially relevant here?

13                 MR. McDONALD:  I don't have a specific number, your

14     Honor, but I would say it's a large percentage of them.

15           And just to give your Honor a little bit of context,

16     defendant Wright also maintained one cell phone that was a

17     clean cell phone.  On some of these intercepted communications,

18     one that I'm thinking of in particular, defendant William

19     Amarizan calls defendant Marquis Wright and says is this your

20     dirty cell phone.  He says yes, go ahead.  And then they

21     proceed to discuss narcotics distribution activity.

22                 THE COURT:  Which is I take it your way of saying that

23     of the 10,000 calls, it's reasonable to assume not that many

24     are going to be, from your perspective, clean calls, that these

25     are phones to which are allocated calls in furtherance of the

FCBLECHC

```
 1    gang.

 2                MR. McDONALD:  Correct, your Honor.  That was the

 3    purpose of these cell phones.  They were dropped on a regular

 4    basis.

 5                THE COURT:  All right.  So from a planning perspective

 6    what it means is that defense counsel who received the

 7    discovery here, potentially they're going to be going through a

 8    great number of potentially relevant calls.

 9                MR. McDONALD:  That's correct, your Honor.

10                THE COURT:  Okay.  How useful will the line sheets be?

11    What I'm trying to do is make an early gauge of how much work

12    there will be and what shortcuts or road maps there will be for

13    the defense to take the measure of the case.

14                MR. McDONALD:  Your Honor, the line sheets will be

15    useful for the Southern District of New York intercepts.

16    There's a second category of intercepts which I'll -- just to

17    stay with the Southern District intercepts, those are full line

18    sheets.  They're draft transcriptions, but they're draft

19    transcriptions of the full conversations.  They're the

20    traditional line sheets that defense counsel will have seen

21    that list the phone numbers, the time of the call, the duration

22    of the call, and the content to the best of the transcriber's

23    ability.

24                THE COURT:  And I take it the stipulation you have in

25    mind is one that makes it clear that the government is not
```

FCBLECHC

1    bound by any of the rough or draft transcripts that were

2    created for investigative purposes.

3              MR. McDONALD:  That's exactly right, your Honor.

4              THE COURT:  Okay.  Go ahead.

5              MR. McDONALD:  There is a second category of Title III

6    intercepts and these are Title III intercepts that were

7    conducted pursuant to an order of interception or to four

8    separate orders of interception issued by the Northern District

9    of New York.  Two of those orders related to a cellular

10   telephone utilized by an individual who is not named in this

11   indictment, but there were relevant communications intercepted.

12             THE COURT:  Including with defendants here?

13             MR. McDONALD:  Including with defendants here, yes, on

14   that intercept.  A much smaller percentage of those intercepts

15   would be relevant to this case, but there are some, and we're

16   prepared to produce everything.

17             THE COURT:  And is there some way in which to guide

18   defense counsel, you'll be able to steer them to calls that are

19   of more likely relevance to this case?

20             MR. McDONALD:  We will, your Honor.

21             So there were two orders of interception issued by the

22   Northern District of New York as to a target who is not named

23   in this indictment but as to whom a number of the defendants

24   appear on the intercepted communications.  There were also two

25   orders of interception issued in the Northern District of New

FCBLECHC

1    York that intercepted communications from two different

2    cellular telephones used by Jonathan Rodriguez, who is the

3    defendant listed first in this indictment.

4              THE COURT:  Right.

5              MR. McDONALD:  These interceptions occurred --

6              THE COURT:  Is there a reason he's listed first?  Is

7    he denoted as a leader of the gang?

8              MR. McDONALD:  He is denoted as a leader of the gang,

9    your Honor.

10             These intercepted communications occurred from April

11   of 2015 to June of 2015.  As to those, just like as to the

12   Southern District of New York intercepted communications, we'll

13   produce the applications, the orders, the calls, and the draft

14   transcriptions.  Those draft transcriptions are not the

15   traditional line sheets like we have here in the Southern

16   District of New York.  They're draft summaries.  We don't have

17   all the audio calls in our possession right now, but we expect

18   to get them.  I was informed yesterday that we expect to get

19   them by the end of the day today.

20             THE COURT:  And anything you can tell me about scale

21   with respect to the four Northern District cell phones,

22   including the two relating to Rodriguez?

23             MR. McDONALD:  I don't have an exact number, your

24   Honor, but it's in the thousands.  I don't think it's more than

25   10,000, but I think it's of a similar volume to the Southern

FCBLECHC

1    District of New York.

2              THE COURT:  As to the Rodriguez calls, is it your

3    expectation that those two are overwhelmingly potentially

4    relevant here as opposed to extraneous?

5              MR. McDONALD:  They are overwhelmingly potentially

6    relevant.  Rodriguez had more clean conversations, but those

7    weren't intercepted because they were nonpertinent.

8              In terms of the intercepted communications, yes,

9    Rodriguez went to Massena, New York, in large part to further

10   and to expand 18 Park's narcotics distribution activity and to

11   move it up to Massena, New York, or expand it to Massena, New

12   York, where the narcotics could be sold for higher prices.  He

13   also, it's revealed from the intercepted communications, moved

14   to Massena, New York, because he was aware of this federal

15   investigation and he was hoping to evade law enforcement.  But

16   one of the purposes of moving to upstate New York was to expand

17   18 Park's drug trafficking there.

18             A number of the defendants here are implicated in that

19   drug trafficking activity, including arrests in Massena, New

20   York, communications with Jonathan Rodriguez, and seizures of

21   narcotics when they were being transported up to him in

22   Massena, New York.

23             THE COURT:  Okay.  So just to recap as to the Title

24   IIIs, you'll be producing all the underlying applications for

25   all of these Title IIIs.

FCBLECHC

1          MR. McDONALD:  Yes, your Honor.

2          THE COURT:  And you'll be producing ultimately the

3     line sheets or their equivalent, as well as the actual audio

4     intercepts.

5          MR. McDONALD:  Yes, your Honor.  And when we're

6     through the different categories, the government has a proposed

7     schedule.  We expect to be able to do that in the next 30 days.

8          THE COURT:  Let's go through the other categories and

9     then you can give me the schedule.  Thank you.

10          MR. McDONALD:  There were approximately 50 undercover

11     purchases of narcotics from approximately ten members and

12     associates of 18 Park who are named in this indictment.  In

13     many cases, there is audio and/or video of the purchases.  In

14     every case, there's a lab report of the purchase and there are

15     the accompanying law enforcement documents.

16          THE COURT:  What types of narcotics?

17          MR. McDONALD:  It was crack cocaine and marijuana.

18     And a smaller number of times it was heroin, but it was

19     primarily crack cocaine and marijuana in the undercover buys.

20          Your Honor, there is footage from two different pole

21     cameras, one of which was located at 331 East 146th Street,

22     which is just outside one of the primary stash houses.

23          THE COURT:  Is that near 18 Park itself?

24          MR. McDONALD:  It is, your Honor.

25          THE COURT:  How long was the pole camera up?

FCBLECHC

1          MR. McDONALD:   The pole camera was up from October of

2     2014 to the date of the arrest, December 9, 2015.

3          THE COURT:   Both pole cameras?

4          MR. McDONALD:   That's just one pole camera.

5          There's a second pole camera that was set up in the

6     vicinity of 1114 White Plains Road, which is the location of

7     the apartment where defendant Marquis Wright resides.   That

8     pole camera was up from August of 2015 to the date of the

9     arrest, December 9, 2015.

10          There is also surveillance video and photographs of

11    the defendants that were taken during the course of this

12    investigation.

13          The way the surveillance works in the Patterson

14    Houses, there are New York City Housing Authority cameras that

15    are constantly running.   They're retained for a short period of

16    time.   And when we request particular footage, they will

17    download the footage and give it to us.   So we have that

18    footage as it relates to a number of the violent incidents that

19    are listed in the indictment, as well as a number of other

20    incidents that are relevant to the investigation.

21          There was a live video feed that was set up in the New

22    York City Housing Authority, the Patterson Houses building, 331

23    East 146th Street, just outside the apartment in that building

24    which was used as one of the primary stash houses.

25          THE COURT:   This video feed was set up for

FCBLECHC

1    investigative purposes?

2         MR. McDONALD:  It was set up for investigative

3    purposes.

4         (Pause)

5         MR. McDONALD:  Your Honor, that camera was set up for

6    security purposes, though the management of the building gave

7    access --

8         THE COURT:  Thank you.

9         MR. McDONALD:  -- to law enforcement.

10        Also, your Honor, there were a number of search

11   warrants that had been executed.

12        To begin, there were two search warrants that were

13   executed in connection with the arrests in this case.  One

14   search warrant was executed on the same 1114 White Plains Road

15   address that I mentioned earlier, the residence of defendant

16   Marquis Wright.  That search warrant uncovered three cell

17   phones; approximately 14 grams of crack cocaine that was laid

18   out on a cookie sheet drying -- it had just been cooked in the

19   kitchen -- above the kitchen cabinets; approximately 50 grams

20   of powder cocaine; approximately 72 grams of marijuana; about

21   $3,000 of cash.

22        There were a number of other search warrants.  I guess

23   one more that was executed on December 9.  That was the search

24   warrant that was executed at 331 East 146th Street.  Narcotics

25   paraphernalia was discovered there.

FCBLECHC

1    There were several other search warrants.  There was a

2    search warrant that was executed June 11, 2015, on the

3    residence of defendant Andrew Echevarria.  Crack cocaine, a

4    firearm, and ammunition were recovered.

5        There was a search warrant that was executed on

6    December 12, 2013 on the residence of Mia Dentico, which was at

7    the time 18 Park's primary stash house.  There were 130 grams

8    of crack cocaine; a number of other quantities and types of

9    narcotics; a number of different types of live rounds of

10   ammunition; large amount of cash; and nine other, in addition

11   to defendant Dentico who was present, nine other defendants

12   named in the indictment were present during the execution of

13   that search warrant.

14       MR. DUNN:  Your Honor, I'm sorry to interrupt.  I have

15   to be up in the Bronx at 11:30.  Mr. Siegel will cover the rest

16   if that's okay with your Honor.

17       THE COURT:  It is.  I thank you.

18       MR. DUNN:  Thank you.

19       MR. McDONALD:  There were a number of other search

20   warrants, your Honor, on various cellular telephones that were

21   seized in connection with arrests of a number of the different

22   defendants.  Those search warrants were conducted pursuant to

23   delayed notice provisions.

24       THE COURT:  Sorry.  The arrests though, are these the

25   arrests that took place this week or earlier?

FCBLECHC

1          MR. McDONALD:  No, your Honor.  Those are prior state

2     arrests.

3          THE COURT:  But those searches are pursuant to

4     warrant?

5          MR. McDONALD:  They're pursuant to a federal warrant,

6     your Honor.  The federal warrant had a delayed notice

7     provision.  These were sneak and peek search warrants so as not

8     to alert the defendants to the federal investigation or at

9     least to the scope of the federal investigation or the

10    particular targets.

11         One of those search warrants was executed on a

12    cellular telephone that was seized from defendant Jordan Rivera

13    in connection with one of his state arrests.  Among other

14    things, on that cellular telephone is a video that Jordan

15    Rivera took of himself.  It appears from the context of the

16    video that he is planning to send it to a female with whom he's

17    associated.  And in that video he says, and I'm quoting from

18    the video, it was for the family.  I had to shoot that -- I'll

19    paraphrase a little bit.

20         THE COURT:  I had to shoot a person, not shoot a

21    video?

22         MR. McDONALD:  Your Honor, to quote it:  I had to

23    shoot that nigga.  That nigga jumped my brother.  I ain't going

24    to lie.  I'm going to kill one of those niggas.  I just want

25    you to hold me down while I'm in jail.  The feds, fuck the

FCBLECHC

1    feds.  I don't give a fuck about the feds.  Suck my dick

2    motherfucker.

3         I apologize for the language, your Honor.  There's a

4    number of other evidence of that variety that was seized from

5    the cellular telephones that were searched pursuant to a

6    federal search warrant subject to a sneak and peek provision.

7         THE COURT:  Were other phones seized incident to the

8    arrests this week?

9         MR. McDONALD:  There were a number of other phones

10   incident to the arrests this week.  The government has not

11   obtained search warrants for those.  We expect that we will.

12   That's an example, your Honor, of the type of thing we expect

13   to produce in the second category of discovery when we get to

14   the various phases.  The government's proposal is there be a

15   Phase 1, which would be the first 30-day period; Phase 2, which

16   would be the second.

17        THE COURT:  Let's round out the discovery and then

18   talk about the phases.

19        MR. McDONALD:  So that in large part covers the search

20   warrants that would potentially be at issue in this case.

21        THE COURT:  What other discovery is there in the case?

22        MR. McDONALD:  There are a number of prison calls and

23   emails, your Honor, from both federal and state facilities,

24   with respect to a number of the different defendants.

25        In another category there are the associated law

FCBLECHC

1    enforcement materials or the law enforcement materials that are

2    associated with the numerous violent acts that are under

3    investigation, many of which are listed in the indictment.

4           THE COURT:  When you say law enforcement materials, I

5    think I have some sense of this from the prior case I

6    mentioned, but what are you referring to specifically?

7           MR. McDONALD:  Complaint reports, arrest reports.  To

8    the extent that they are Rule 16 discovery and not Rule 3500,

9    the material that's in the state case file.  Most of these

10   incidents were initially investigated by the state.  There was

11   New York City Police Department paperwork, again, complaint

12   reports, arrest reports, booking information.

13          THE COURT:  In other words, you've already taken the

14   trouble to go get those files so that to the extent there are

15   records of, hypothetically, fingerprints or bullet fragments,

16   you've got that stuff or you've tried to.

17          MR. McDONALD:  That's correct, your Honor.

18          It also includes the full criminal history and arrest

19   reports for each of the defendants.  We have unsealed those as

20   to each of the defendants.  We're currently in possession of

21   the arrest report for every one of the prior arrests of every

22   one of these defendants.  It's possible there are a few

23   youthful offender arrests that we're not aware of, but I do

24   believe that we're aware of every one of their prior arrests

25   and that we have all of the records.

FCBLECHC

1          THE COURT:  Okay.  Good.  Does this cover the species

2      of discovery or is there more?

3          MR. McDONALD:  There's a little bit more, your Honor.

4          THE COURT:  Go ahead.

5          MR. McDONALD:  The defendants have communicated about

6      gang activity over social media and in particular over

7      Facebook.  I mentioned just one example, the message that

8      defendant Wali Burgos sent to the rival gang leader after the

9      attempted murder saying "almost."  The government has obtained

10     a Facebook search warrant and we have the returns of that

11     Facebook search warrant.  Those returns are voluminous.  They

12     are tens of thousands of PDF pages.

13         THE COURT:  How many defendants have Facebook accounts

14     that you've gotten?

15         MR. McDONALD:  Your Honor, I don't have the number in

16     front of me, but it's the vast majority.  In fact, I think

17     every one of the defendants had a Facebook account.  I'm not

18     certain about that, but it's close to that, if not all of them.

19         The final category, your Honor, is just individual

20     discovery with respect to each defendant.  This would be the

21     pedigree information that was taken upon this arrest, the

22     photos of tattoos, I mentioned criminal history and arrest

23     reports that we had unsealed, any statement made to law

24     enforcement either in connection with these arrests or in prior

25     related matters.

FCBLECHC

1          Now, I am not aware right now of any statements to law

2     enforcement that were made during the December 9.

3          THE COURT:  That's getting to search/seizure issues.

4     All right.

5          In terms of Rule 16 discovery, you mentioned several

6     times a discovery plan.  Tell me about it.

7          MR. McDONALD:  Your Honor, the government proposes

8     that discovery proceed in two phases.  Phase 1 would take place

9     over the next 30-day period.  We expect to have Phase 1

10    completed within 30 days, and the material that I'm about to

11    mention would be produced on a rolling basis over that 30-day

12    period.  That would include both the Southern District of New

13    York wiretaps and associated materials and the Northern

14    District of New York wiretaps and associated materials; the

15    prison calls and emails from the federal and state facilities;

16    the materials related to the undercover purchases, which

17    includes the audio and video where it was available; the pole

18    camera footage, and I'll come back to that in just a minute,

19    but the pole camera footage; the Facebook search warrants, the

20    returns, the associated orders and applications; and the

21    individual discovery including the raps, pedigrees, any

22    statements, photographs.  We propose to have that completed

23    within the first 30-day period.

24          And then we propose for there to be a second phase or

25    a second 30-day period.  In that second 30-day period, we would

FCBLECHC

1    produce the search warrants and associated materials from the

2    December 9 arrests and executions of the search warrant.  That

3    would include the application, the items seized, any video or

4    photo that was taken in connection with either the arrests or

5    the execution of the search warrants.  The reason that we

6    propose this to be part of the second phase is some of that

7    material hasn't been generated yet, like lab reports with

8    respect to the drugs that were seized.

9            THE COURT:  I take it the affidavits and applications

10   could be produced quickly.  It's the returns; it's the

11   byproduct of the search that's more problematic.

12           MR. McDONALD:  That's correct, your Honor.  I probably

13   should have included part of this in Phase 1.  I expect we will

14   be able to produce the search warrants and the affidavits.

15           THE COURT:  Why don't we move that to Phase 1 if it's

16   preexisting.

17           MR. McDONALD:  Of course.

18           The second category of material that we would include

19   in Phase 2 are the NYPD complaint reports, arrest reports, and

20   associated discoverable materials that I had mentioned

21   previously with respect to the incidents of violence and other

22   illegal conduct that's alleged in the indictment.  The reason

23   that we would put that in the second category is with respect

24   to those we have -- we have almost all of it.  We're still

25   working to make sure that we have the complete universe of

FCBLECHC

1    documents.

2              THE COURT:  Can I ask you as to that material, is that

3    old-fashioned hard copy or is it kept electronically?

4              MR. McDONALD:  It's old-fashioned hard copy, your

5    Honor, but we've scanned it and we have it in electronic

6    format.  And a lot of that material needs to be redacted and

7    because of the volume of that material, it's going to take us

8    just a little bit of time to complete the redaction process.

9    The reason we want 60 days for that is because we know that

10   that redaction process can take some time.

11             And then, finally, the individual discovery that

12   includes the sealed arrests from each defendant, same issue

13   with respect to redactions.  There are a number of victims who

14   are included on that paperwork.  There are a number of other

15   sensitive information that we would need to redact.  And like I

16   said, we have all of that information.  It's subject to an

17   unsealing order, but it's voluminous.  It will take us a little

18   while to go through it to redact it.

19             Finally, any new discovery that's generated after this

20   date.  As I mentioned earlier, this investigation is ongoing.

21   And, in particular, it's ongoing with respect to both the

22   May 29, 2011 murder of Johnny Moore and with respect to other

23   murders and attempted murders.

24             THE COURT:  So as to new discovery, you've already

25   identified a few categories.  One is that there are, for

FCBLECHC

1    example, cell phones that you've received but not yet got

2    warrants to or in any event searched.  Another is that the

3    investigation is ongoing; you may learn about other incidents

4    and that may occasion such things as looking at new state court

5    files and the like.

6         MR. McDONALD:  Yes, your Honor.

7         THE COURT:  All right.  Is it really the case that

8    there were no postarrest statements from any of the people

9    arrested this week?

10        MR. McDONALD:  Your Honor, there were no postarrest

11   statements made during debriefings that we're aware of.  We are

12   not yet aware with respect to each of the defendants whether

13   there were any spontaneous statements or any statements made to

14   law enforcement that we're in a position to represent to the

15   Court now during the course of the arrests.  There were dozens

16   of arrests on Wednesday, and we just haven't had the time to

17   debrief each of the officers.

18        THE COURT:  You may yet learn of them, but you don't

19   know now.

20        MR. McDONALD:  I don't want to represent that there

21   were none, but there are none we're prepared to represent to

22   the Court.

23        THE COURT:  Help me with the mechanics of this.  In

24   the previous case I've alluded to a few times, a discovery

25   coordinator was appointed who functioned as something of a

FCBLECHC

1    clearinghouse and, in effect, a common database was used.  Have

2    you given thought to the mechanics of making this vast amount

3    of material available to a couple dozen defense counsel?

4          MR. McDONALD:  Yes, your Honor, and we have a proposal

5    on that as well.  I believe this tracks what was done in the

6    Trinitarios case, that there would be hard drives provided to

7    the government that would be paid for by the CJA office.  We

8    would then load it with discovery.  We would give the hard

9    drives back to defense counsel, and we would make those hard

10   drives available at the jails.

11         We're still working out the specifics as to how that

12   material would be made available at the jail at the different

13   facilities.  But what had been done in the past and what I

14   expect we'll be able to arrange here would be to have that

15   material available for the defendants in the library and they

16   could view it even outside the ordinary library time periods.

17   Again, we're still working on that.  It depends on how many

18   defendants ultimately end up at each different facility.

19         THE COURT:  With a hiccup here and there, there was I

20   thought actually a very good functioning system in the

21   Trinitarios case.  I'm more interested in issues relating to,

22   for example, the scale presented by the Title IIIs.  If memory

23   serves, those weren't I think provided entirely on individual

24   hard drives so much as there was a common database to which

25   counsel had access.

1          MR. McDONALD:  So the two things that would not go on

2     the hard drive are the Title III and the pole camera footage.

3     And with respect to both of those, we would propose using a CJA

4     discovery coordinator.  And we would either have a central

5     database for the Title III material, or we would simply provide

6     it to the CJA discovery coordinator.

7          THE COURT:  How do you go about getting that?  I'm all

8     in favor of that.  It seemed to work well last time, and it was

9     useful to have one person who owned that process.  How quickly

10    can you get that up and running?

11         MR. McDONALD:  I'm not sure exactly how quickly we can

12    get it up and running, but we'll work as quickly as we possibly

13    can.

14         THE COURT:  I see here Ms. Heller; you obviously have

15    a good resource for working through that.  But I encourage you

16    to prioritize it because it worked very well last time and I

17    think the sooner you can get that architecture set up, the

18    better.

19         MR. McDONALD:  Yes, your Honor.  We've been working on

20    it.  We'll continue to work on it as soon as we leave the court

21    today.

22         THE COURT:  Anything further you want to bring to my

23    attention with respect to Rule 16 discovery?

24         MR. McDONALD:  Nothing with respect to Rule 16.

25         THE COURT:  Were you about to say something?

FCBLECHC

```
 1              MR. McDONALD:  Go ahead.

 2              THE COURT:  The next topic I had and I think you've

 3   largely but perhaps not completely covered this is usually in

 4   criminal cases, I try to spot at the initial conference the

 5   outer range of law enforcement activity that by its nature

 6   tends to produce occasionally, anyway, suppression motions:

 7   searches, seizures, postarrest statements, identification

 8   procedures.  More often than not, it's warrantless searches and

 9   seizures that generate motion practice.

10              Is there anything you can tell me now that can give me

11   a shape of the whole or give individual defendants a little

12   more color as to what's out there?

13              MR. McDONALD:  Your Honor, I think we've largely

14   covered it in our discussion about the Rule 16 material.  The

15   Title III wiretaps, the searches and seizures that we had

16   discussed and evidence of that sort.

17              My colleague reminds me that the police files for

18   those incidents will make evident the Fourth Amendment events.

19   For each of the particular incidents there are a variety of

20   Fourth Amendment events.  Many of them -- for example, one of

21   the defendants is stopped.  He's stopped because there's video

22   surveillance that shows the defendants committing a shooting.

23   After having viewed the video surveillance, the officer stops

24   the defendant having recognized him from the video and

25   recognized him in the vicinity of the Patterson Houses area or
```

FCBLECHC

1     in the vicinity of where the shooting occurred, stops him,

2     frisks him, and finds a gun.  There are a number of incidents

3     like that.  I don't want to go through each one of them.

4             But in terms of the categories, I think there are the

5     Title III intercepts, the searches and seizures conducted

6     pursuant to warrants, and then the searches and seizures

7     conducted without a warrant but pursuant to some other valid

8     basis.

9             THE COURT:  So in smaller criminal cases, I tend to

10    use the second conference as the deadline for defense counsel

11    to indicate if they want to make a suppression motion.  From

12    everything you told me, that's completely unrealistic here

13    because defense counsel will need to, among other things,

14    burrow through the state court incident files, if you will, to

15    determine whether, for example, there might be a search or

16    seizure that they would want to challenge.

17            Am I reading that right?

18            MR. McDONALD:  I think that's correct, your Honor.

19    The only thing that I'd say is that from the government's

20    perspective, that discovery is voluminous.  But from each

21    particular individual defendant's perspective --

22            THE COURT:  There's the matter of finding Waldo,

23    right.  The problem is you've got so much material here that it

24    may not be realistic on the discovery schedule to throw the

25    burden on any counsel by 60 days from now or two and a half

FCBLECHC

1    months from now to even know the range of potential Fourth

2    Amendment activity to which they may have standing to

3    challenge.

4                    MR. McDONALD:  Sure.

5                    THE COURT:  All right.  That's extremely helpful.  Let

6    me just pause and compliment you for a very well organized,

7    helpful presentation.  Obviously, helpful to me, but I'm sure

8    it's extremely helpful to defense counsel, as well, just to get

9    a shape of what lies ahead.

10                   With that in mind, before I call on the defense, it

11   had been my intention to schedule a next conference probably in

12   the first week of March or so, anticipating something like

13   this.  Does the government have a view about that?

14                   MR. McDONALD:  I believe before your Honor took the

15   bench, we had discussed the possibility of March 2.  That would

16   work for the government.

17                   THE COURT:  Not just a matter of your availability,

18   but does that sound like a realistic time to next check in

19   given the range of discovery that's about to be made available?

20                   MR. McDONALD:  I think it does, your Honor.  The first

21   30-day phase would end January 11.  The second 30-day phase

22   would end I believe on February 10.  That would be about a

23   month after that second 30-day phase.  To the extent there are

24   any issues the parties would need to bring before the Court, I

25   think that would give us about a month to work on resolving

1    them before we brought them to the Court.

2            Your Honor is correct that it may not be that defense

3    counsel is aware of all of the Fourth Amendment issues that

4    defense counsel may want to bring to your attention, but I

5    think they would be aware of the major ones at that point to

6    the extent there are any.

7            THE COURT:  Okay.  Thank you.

8            Let me turn now to the defense.  Again, focusing on

9    macro issues, not defendant specific issues, anything anyone

10   wants to bring to my attention or raise at this point?  I

11   realize this all landed on you in the last 48 hours, but we

12   have estimable and multiple defense counsel here.  Any views?

13           Mr. Siegel, I'll ask everyone to use the microphone

14   near Mr. London just so we can all hear.

15           MR. SIEGEL:  I have a microphone here.  Jesse Siegel

16   for Wilfredo Rivera.

17           Just listening to the volume of discovery, happy to

18   come back in March, but it doesn't really seem like we're going

19   to do anything more at that point or be able to do anything

20   more than just hear from the government whether more discovery

21   is coming our way.  It's hard to imagine we're going to really

22   have a handle in any meaningful way on this volume of discovery

23   at that time.  So if that's what the Court thinks is useful,

24   happy to do it, but I don't think it's realistic to expect more

25   than that.

FCBLECHC

1          THE COURT:  Well, I think it's not realistic to impose

2     on the defense at that point an obligation to come forward and

3     commit to suppression hearings; that certainly I agree with you

4     on.  But I'm quite reluctant to defer a next conference until

5     much after that because you all may be discovering things about

6     the case that you urgently want to bring to my attention or

7     there may be some scheduling things we can do to get out of the

8     way.  It also is, frankly, a useful way for me to check in to

9     make sure that all the discovery protocols here are working.

10         Veterans of the last case will know, will report to

11    all of you, and there are several among the defense group here,

12    that there were occasional hiccups with respect to defendant

13    access to discovery at the MDC or MCC.  And it was useful,

14    frankly, as an enforcement device to have a conference here

15    before me.  It made sure that everyone ventilated those issues.

16    It made sure that meaningful access was in fact being provided.

17         So it seems to me that while I may have been more

18    ambitious in my thinking behind yesterday's order about what

19    might be able to be accomplished at the next conference, it's

20    important for us all to gather.

21         MR. SIEGEL:  I agree, just to touch base about that.

22    It's also my experience when I hear 30 days and 60 days, I'm

23    thinking 45 days and 75 days because there are these hiccups

24    which are inevitable.

25         THE COURT:  All right.  Thank you, Mr. Siegel.

FCBLECHC

1          Any other views?  Mr. DiChiara, just use the

2     microphone.

3          MR. DiCHIARA:  Gerald DiChiara, your Honor.  I would

4     ask if the Court would authorize for CJA a transcript of

5     today's proceedings.

6          THE COURT:  Authorized.

7          And, in fact, Mr. McDonald, I was going to say to you

8     the following.  Inasmuch as you're going to be having other

9     defendants brought into the case, your presentation here was

10    exceptionally helpful.  I'm not going to make you give it at

11    each individual conference.  So please make that transcript

12    available to counsel as they come into the case for other

13    defendants so that when we have an initial conference, I can

14    incorporate that by reference.

15         MR. McDONALD:  Of course, your Honor.

16         THE COURT:  All right.  Anyone else on the defense

17    side?

18         MR. TULMAN:  Good morning, your Honor.  Scott Tulman

19    for Kaye Rosado.  I apologize, your Honor, I was tardy.

20    Mr. Dunn, Tom Dunn, initially stood up for me and he left and I

21    had been here for some time at that point.

22         THE COURT:  You notified my chambers you were running

23    late and I appreciate it.

24         MR. TULMAN:  Your Honor, just one consideration and

25    that is with respect to the hard drives.  And I know that this

FCBLECHC

1   is, particularly given the number of defendants and given the

2   lack of resources with the hard drive, if there's some way to

3   somehow figure out how to get these on discs because I know

4   that at the MCC, there are at the individual floors the inmates

5   are able to view it on discs.

6          THE COURT:  You're making a point as to access for the

7   defendants as opposed to counsel.

8          MR. TULMAN:  Yes, I'm addressing the issue of access

9   of the defendants, because a lot of times, of course, it's the

10  defendants who know best the discovery that they need to review

11  and so it's just a consideration about making up discs as well.

12         THE COURT:  All right.  At this point, we're enough

13  under the hood that it's not productive for me to resolve it.

14         I'll just say this, Mr. McDonald.  I don't know that

15  any of us can foresee the technology that's going to be

16  necessary.  Mr. Tulman makes a good point that it may be that

17  some other mechanical way of making it usefully available is

18  better.  I know you'll be sensitive to that.  And when we have

19  discovery counsel in place, coordinator in place, that person

20  will own this as well.  But I trust you'll be receptive to

21  concerns like that.

22         MR. McDONALD:  Yes, your Honor.

23         THE COURT:  Anyone else?

24         Let me just confirm what I think is obvious.  I take

25  it no defense counsel is seeking a trial date at this point?

FCBLECHC

1          MR. SIEGEL:  No, your Honor.

2          MS. CARVLIN:  No, your Honor.

3          THE COURT:  The record will reflect a chorus of no's.

4          All right.  Given that, is there any reason I

5     shouldn't set as our next conference March 2 at 9:30?

6          MR. McDONALD:  Works for the government, your Honor.

7          THE COURT:  I'm going to set the next conference for

8     March 2 at 9:30.

9          I expect at that conference, among other things, the

10    following will happen.  I will want a detailed report from the

11    government on the status of discovery.  Certainly, my hope is

12    that you'll be able to comply with the schedule that you've set

13    out as to the production of discovery, but I also expect that

14    there will be inevitably some more discovery and I'll want a

15    report of the same nature that you gave today as to that.

16         I'm also going to be very interested in mechanical

17    issues regarding access to discovery.  I expect government

18    counsel and defense counsel will be in close coordination with

19    what I expect will be a soon to be appointed discovery

20    coordinator so I can learn about any issues.  It goes without

21    saying that if any hiccups arise, any issues that any counsel

22    is aware of, if you can't resolve it yourself, make an

23    application to me.  Sometimes my intervention can help get the

24    relevant party's attention.

25         Government, I will want at that next conference to

FCBLECHC

1    understand where we're headed here.  I think it's important for

2    the defense to have the two and a half months to begin to make

3    sense of the discovery material.

4         And, defense, I expect you, notwithstanding that I'm

5    not going to be requiring you to announce suppression motions

6    at the next conference, I expect you to be working hard to get

7    through this material so that you have a sense of the direction

8    of the case from your perspective.

9         Government, I'll ask you with all the things you've

10   got going to prioritize communicating to individual defense

11   counsel where to look to the best of your knowledge in the

12   discovery material for the matters most relevant to each

13   client.  Putting myself in the shoes of defense counsel, it's

14   very hard to know where to look in the Rule 16 material.  So I

15   encourage you to be proactive in alerting defense counsel,

16   understanding that your knowledge is bounded by what you know

17   at any particular time, what the particular incidents are, what

18   the calls are that you think would be most productive for them

19   to look at.  The sooner we can arrive at some greater parity of

20   information, the sooner the log jam begins to break.

21        MR. McDONALD:  Yes, your Honor.

22        THE COURT:  All right.  Defense, I would like to ask

23   that somebody step up within the defense group to be a de facto

24   coordinator.  I'm not, to be clear, asking that you form a

25   joint defense group; and I'm not asking, to be clear, that

FCBLECHC

1  somebody be the head of it.  I want one person who can play

2  round up here, who can, if I issue an order with respect to

3  dates, I don't want to have to get 15 letters.  I'd like

4  somebody to be corralling the troops just for logistical

5  purposes.

6        MR. LONDON:  I nominate Jesse Siegel.

7        THE COURT:  Mr. Siegel, are you going to give a

8  Sherman-like denial here?

9        MR. SIEGEL:  If drafted, I will serve, Judge.

10        THE COURT:  You're drafted.

11        To be clear, Mr. Siegel is not here to clean the

12  Augean stables.  He's here simply because he's graciously as a

13  respected veteran of the panel and these cases to communicate

14  among you.  Please get Mr. Siegel your contact, in particular

15  email information, so that a defense group can arise promptly.

16        Mr. Siegel, thank you.

17        MR. SIEGEL:  Thank you, Judge.

18        THE COURT:  Is there an application for the exclusion

19  of time between now and March 2?

20        MR. McDONALD:  There is, your Honor.  The government

21  moves to exclude time under the Speedy Trial Act so that the

22  defense counsel and the defendants can begin reviewing

23  discovery and so that the parties can discuss possible

24  resolutions of the case short of trial.

25        THE COURT:  Okay.  Any objection to the exclusion of

FCBLECHC

1    time?

2              MS. CARVLIN:  No, Judge.

3              THE COURT:  I'll exclude the time between now and

4    March 2 pursuant to Title 18, United States Code, Section

5    3161(h)(7)(A).  For avoidance of doubt, that time runs as to

6    all defendants in the case, not merely the ones who are

7    present.  I am doing so because there is an overwhelmingly good

8    reason to think that the interests of justice support the

9    exclusion of time and outweigh the interests of the public and

10   the defendants in a speedy trial.

11             Most obviously, there is a veritable dump truck of

12   Rule 16 material that is going to be served upon or made

13   available to defense counsel, who have a lot of work ahead of

14   them.  And I want to make sure the defense counsel has plenty

15   of time to begin to make sense of this multidimensional,

16   complicated, important case.

17             In addition, I'm mindful that defense counsel have

18   only gotten to know their clients with perhaps one or two

19   exceptions in the last 48 hours.  So the time excluded is also

20   intended to allow defense counsel to connect with their clients

21   and begin to understand the situation presented by each of

22   their individual situations and to begin to make appropriate

23   investigation.

24             Government, I'm going to ask you to submit a letter

25   three work days before the next conference giving me a report

FCBLECHC

1    on all things relating to the case.  I'll ask you to confer

2    with the defense beforehand.  The goal here is as follows.

3    When I've got 25 defendants and defense counsel in a room, it's

4    hard to be very nimble in resolving things.  And so to the

5    extent there are issues or things productively brought to my

6    attention beforehand, I can reflect on that and be better

7    prepared before the next conference.

8         So three work days before the next conference, I'd

9    like a status report from the government informed by your

10   discussions with the defense such that if, for example, there

11   are practical issues vis-a-vis discovery that you're becoming

12   aware of, your letter should reflect your knowledge based on

13   your conversations with defense counsel.

14        All right?

15        MR. McDONALD:  Yes, your Honor.

16        The final thing from the government, I know the Court

17   will be aware of this, but I believe in order for us to

18   actually proceed with the discovery coordinator, the Court

19   needs to appoint the discovery coordinator.

20        THE COURT:  Very good.  Just get me an order.  I'll be

21   glad to appoint one.  I believe it was Emma Greenwood who was

22   discovery coordinator last time.  I don't know that one person

23   should do this twice in a lifetime, but if she's willing, she

24   was great.

25        Anything further from the government?

FCBLECHC

1              MR. McDONALD:  Nothing further, your Honor.

2              THE COURT:  Anything from any defense counsel?

3              MS. CARVLIN:  No, your Honor.

4              THE COURT:  Thank you.  I wish you all well.

5              We will resume in 15 minutes to complete the hearing

6     on the bail appeal with respect to defendants Dentico and

7     Brown.  We'll do that here.

8              Thank you.

9                                   o0o

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25